Benjamin EVERSON, Plaintiff,

v.

NEW YORK CITY TRANSIT
AUTHORITY and Thomas
Calandrella, Defendants.

No. 02 CV 1121(ILG).

United States District Court,
E.D. New York.

Aug. 12, 2002.

Steven Friedman, Esq., Leeds Morelli & Brown, P.C., Carle Place, NY, for Plaintiff.

Robert K. Drinan, Esq., Assistant General Counsel, NYCTA, Brooklyn, NY, for Defendants.

*MEMORANDUM & ORDER*

GLASSER, District Judge.

In this employment discrimination action, plaintiff Benjamin Everson ("Everson") alleges that his employer, the New York City Transit Authority (the "NYCTA"), and his immediate supervisor at the NYCTA, Thomas Calandrella ("Calandrella"), discriminated against him on the basis of his race, in violation of Title VII and state and local law. The NYCTA now moves to dismiss certain of Everson's claims.[1] For the reasons set forth below, the NYCTA's motion is granted in part and denied in part.

*BACKGROUND*

Everson is an African–American male who commenced employment with the NYCTA on June 2, 1970. (Compl.¶ 8.) Everson currently serves as a General Superintendent in the MOW Department, Division of Track. (*Id.*) Despite what he describes as his "exemplary work record" (*id.* ¶ 9), Everson has been denied promotions on nine separate occasions, with the promotion going to a white male each time (*id.* ¶ 10–11).[2] Specifically, Everson alleges as follows:

1. That on June 30, 1995, he applied and was interviewed for a Maintenance Officer's position in System Maintenance for Subways, but the

---

1. The NYCTA avers that Calandrella has not joined in the NYCTA's motion because he has not yet been served with process. (*See* Def. Mem. at 1 n. 1.) However, a review of the docket sheet in this action indicates that Calandrella was served on February 20, 2002. Accordingly, Everson shall move for a default judgment against Calandrella on or before August 30, 2002, or else Calandrella will be

dismissed from this action for lack of prosecution. *See* Fed.R.Civ.P. 41(b).

2. Although Everson alleges that a white male received each of the positions for which he was seeking promotion, he also alleges that one of the positions was given to a younger black male. (*See* Compl. ¶ 11(a).)

position was given to Fitzroy Thomas, a black male with less experience and seniority.

2. That on September 22, 1995, he applied and was interviewed for a Maintenance Officer's position in Track Construction, but the position was given to Alfonse Wojcik, a white male with less experience and seniority.

3. That on October 6, 1995, he applied and was interviewed for a Maintenance Officer's position in Track Operations, but the position was given to Joseph Caiozzo, a white male with less experience and seniority and who, according to Everson, did not have the requisite skills for the position.

4. That on July 17, 1996, he applied and was interviewed for a Maintenance Officer's position in Structures and Equipment, but the position was given to Robert Buskirk, a white male.

5. That on September 13, 1996, he applied for a Maintenance Officer's position in Power Distribution, but the position was given to Frank Anses, a white male with less experience.

6. That on September 18, 1998, he applied for an Assistant Chief Track Officer's position in Subway Maintenance, but the position was given to Ralph Dellamonica, a white male with less experience and seniority, and whom Everson had trained.

7. That on May 26, 1999, he applied for an Assistant Infrastructure Officer's position in the Division of Maintenance of Way/Infrastructure, but the position was given to Frank Gaetano, a white male with less experience and seniority.

8. That on November 19, 1999, he applied and was interviewed for an Assistant Chief Electrical Officer's position, but the position was given to Richard Curcio, a white male with less experience and seniority.

9. That on March 17, 2000, he applied for a Chief Infrastructure Officer's position, but the position was given to Emiel Albano, a white male.

(Compl. ¶ 11(a)-(i).)

Everson alleges that, in each of the above-described instances, defendant Calandrella—Everson's supervisor and a Chief Track Officer (*id.* ¶ 7)—was the decision-maker who denied Everson's promotion request. (*Id.* ¶ 12.) Everson contends that the decisions to deny him promotions were due to Calandrella's bias against blacks. Everson alleges that Calandrella's bias is evident because: (i) Calandrella once described Everson as a "Nig" to NYCTA employee Guido Boniello, after which Boniello asked Everson, "What is a Nigger?" (*id.*); (ii) Calandrella once called another NYCTA employee a "Nigger," leading to a fight between Calandrella and the employee (*id.* ¶ 13); and (iii) similarly-situated white employees earned higher salaries than Everson (*id.* ¶ 14; *see also id.* ¶ 15). Everson also alleges that Calandrella once told Edward Dixon, another NYCTA employee, that as long as Calandrella remained Chief Track Officer, Everson would never be promoted. (*Id.* ¶ 13.)

Everson filed a complaint with the NYCTA's EEO office in January of 1999, and filed a charge of discrimination with the EEOC in April of 1999. Everson alleges that, since that time, Calandrella has refused to speak with him, even when requests to speak with him were in writing. (*Id.* ¶ 16.) Everson further alleges that, since filing his discrimination charge, his evaluations have been poor and have not accurately reflected his work. (*Id.* ¶ 17.) Everson also alleges that he was subjected to certain other retaliatory acts since his

complaints, including the loss of use of vehicles in which he transported materials, making his job more difficult; the loss of a clerical assistant and an assistant staff analyst; and his transfer from a work location near where he lived to a location in the Bronx, leaving him with a 1½ hour commute in each direction. (*See id.* ¶¶ 19–20.)

As a result of the foregoing, Everson commenced this action against the NYCTA and Calandrella on February 19, 2002. In his complaint, Everson alleges that the decisions to deny his requests for promotions on account of his race violated Title VII; New York Human Rights Law (Executive Law § 290 *et seq.*); New York City Human Rights Law (New York City Administrative Code Title 8); and 42 U.S.C. §§ 1981 and 1983. Everson also alleges that the "retaliation" against him for filing his complaints violated the same laws. Finally, Everson alleges that the defendants conspired to deny his civil rights, in violation of 42 U.S.C. §§ 1985 and 1986. (*See* Compl. ¶¶ 22–31.)

The NYCTA now moves to dismiss portions of Everson's complaint, raising four arguments. First, the NYCTA argues that Everson's conspiracy claim is insufficiently pled, and in any event fails because it is barred by the intra-corporate conspiracy doctrine. (*See* Def. Mem. at 3–5.) Second, the NYCTA argues that certain of Everson's claims are time-barred. Specifically, the NYCTA argues that (i) the Title VII claims are time-barred, because this action was commenced more than 90 days after Everson received a "right to sue" letter from the EEOC, and (ii) claims concerning the denial of promotions before February of 1999—whether brought under Title VII, 42 U.S.C. §§ 1981 and 1983, or state law—are barred by the respective statutes of limitations. (*See id.* at 6–9.) Third, the NYCTA argues that Everson's claim under the New York City Adminis-

trative Code must be dismissed, because a recent amendment to New York law exempted the NYCTA from the reach of local laws. (*See id.* at 9–10.) Finally, the NYCTA argues that Everson's claims, to the extent they seek punitive damages, must be dismissed, because as a public benefit corporation, punitive damages cannot be awarded against the NYCTA. (*See id.* at 10.)

## DISCUSSION

### I. Standard of review

On a Rule 12(b)(6) motion, the Court must accept as true the factual allegations in the complaint and view the complaint in the light most favorable to the non-moving party. *Bolt Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal under Rule 12(b)(6) may only be granted if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of [his] claim which entitle [him] to relief." *Walker v. City of N.Y.,* 974 F.2d 293, 298 (2d Cir.1992) (internal quotations omitted).

### II. The conspiracy claims

The NYCTA's first argument is that Everson has failed to plead facts sufficient to state conspiracy claims, and that, in any event, the conspiracy claims are barred by the intra-corporate conspiracy doctrine. (*See* Def. Mem. at 3–5.) Because the Court concludes that the NYCTA's second argument is correct, it need not address the first argument.

▪▪▪ The intra-corporate conspiracy doctrine, also known as the intra-enterprise conspiracy doctrine, is drawn from Section 1 of the Sherman Act, which prohibits contracts, combinations and conspiracies in restraint of trade. "The evil to which that statute is directed is concerted decisions of two or more business entities to take action 'that, in a competitive world,

each would take separately.' In consequence, the statutory requirement of a plurality of actors is not satisfied by ... employees of a single entity acting within the scope of their employment." *Johnson v. Nyack Hosp.*, 954 F.Supp. 717, 722 (S.D.N.Y.1997) (internal citation omitted). Likewise, under the doctrine, "a corporation generally cannot conspire with its employees or agents as all are considered a single entity." *Rini v. Zwirn*, 886 F.Supp. 270, 291 (E.D.N.Y.1995) (citations omitted). Although the doctrine had its genesis in cases involving corporations, numerous courts, including this Court, have applied the doctrine to public entities. *See, e.g., Zombro v. Balt. City Police Dep't*, 868 F.2d 1364, 1371 (4th Cir.1989); *Silverman v. City of N.Y.*, No. 98–CV–6277, 2001 WL 1776157, at *4 (E.D.N.Y. Nov. 19, 2001); *Huntemann v. City of Yonkers*, No. 95 Civ. 1276, 1997 WL 527880, at *14 (S.D.N.Y. Aug. 25, 1997); *Allen v. City of Chicago*, 828 F.Supp. 543, 564 (N.D.Ill.1993); *Wintz v. Port Auth. of N.Y. & N.J.*, 551 F.Supp. 1323, 1325 (S.D.N.Y.1982); *see also Rini*, 886 F.Supp. at 292 (collecting cases).

Here, Everson alleges that "[d]efendants, acting under color of state law, systematically conspired to prevent plaintiff's promotion and advancement." (Compl.¶ 24.) Everson apparently overlooks the fact that, as a matter of law, the NYCTA cannot conspire with Calandrella, one of its employees, under the intra-corporate conspiracy doctrine. *See Rini*, 886 F.Supp. at 291–92.

■ In his opposition, Everson attempts to invoke an exception to the intracorporate conspiracy doctrine: the "personal interest" exception. As Everson points out, that exception applies where "a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose." *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 360 (E.D.N.Y.1999); *accord Silverman*, 2001 WL 1776157, at *4–5. Everson, however, has not "adequately alleged" that either Calandrella or the NYCTA possessed an independent, personal conspiratorial purpose in denying Everson promotions. Indeed, Everson has pled nothing in the Complaint regarding Calandrella's "motive" other than his purported personal bias against Everson, and "personal bias does not constitute personal interest and is not sufficient to defeat the intra[-]corporate conspiracy doctrine." *Bond v. Bd. of Educ. of City of N.Y.*, No. 97 CV 1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999) (citation omitted); *accord Nyack Hosp.*, 954 F.Supp. at 723. Furthermore, the Complaint contains *no* detail regarding the NYCTA's so-called "conspiratorial purpose" in refusing to promote Everson.[3] Accordingly, the "personal interest" exception does not apply, and Everson's conspiracy claims are dismissed.

### III. *Timeliness of the remaining claims*

The NYCTA next argues that a number of Everson's claims are time-barred. First, the NYCTA argues that the Title VII claims are time-barred, because this action was commenced more than 90 days after Everson received a "right to sue" letter from the EEOC. Second, the NYCTA argues that claims concerning the denial of promotions occurring before February of 1999—whether brought under Title VII, 42 U.S.C. §§ 1981 and 1983, or state law—are barred by the respective statutes of limitations. (*See id.* at 6–9.)

---

**3.** In fact, Everson simply claims that the intra-corporate conspiracy doctrine *"could* apply to plaintiff's case,'' without specifying what individual objectives the defendants were hoping to attain in denying promotions to him. (*See* Pl. Opp. at 6–7.)

### A. The "right to sue" letter

■ Under 42 U.S.C. § 2000e–5(f)(1), a plaintiff "may initiate a Title VII court action within 90 days of the notification by the [EEOC] that it is unable or unwilling to settle the dispute between employee and employer." *Johnson v. Al Tech Specialties Steel Co.*, 731 F.2d 143, 144 (2d Cir.1984). The Second Circuit has interpreted Section 2000e–5(f)(1) to mean that a plaintiff must initiate a Title VII lawsuit within 90 days of *receiving* the EEOC's "right to sue" letter. *See, e.g., Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 127 n. 1 (2d Cir.1996); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir.1996).

■ The "right to sue" letter issued to plaintiff in this case is dated March 15, 2000 (*see* Def. Ex. C)[4], but the Complaint was not filed until February 19, 2002. Thus, it would appear that Everson's Title VII claims are time-barred. Everson alleges, however, that he never received the "right to sue" letter, and that he had no notice of the letter's issuance until December 18, 2001. (*See* Compl. ¶ 3.) Thus, Everson asserts that his Title VII claims are timely, because he initiated this lawsuit within 90 days of receiving notice of the issuance of the letter. (*See* Pl. Opp. at 11–12.)

Everson offers no explanation in the Complaint—such as having moved, for example—as to why he did not receive the letter.[5] Nor does Everson explain how he suddenly became aware of the letter's issuance in December of 2001, a year and a half after it was issued. The NYCTA argues that Everson's mere assertion of "non-receipt" is insufficient to establish that his Title VII claims are timely. The NYCTA also argues that, in light of the presumption that letters are received three days after they are mailed, the Court should presume Everson received the "right to sue" letter on March 18, 2000, and adjudge his Title VII claim untimely.[6]

■ There is some superficial appeal to the NYCTA's arguments. The NYCTA is correct that documents are presumed to be received three days after they are mailed. *Sherlock*, 84 F.3d at 525–26 ("Normally it is assumed that a mailed document is received three days after its mailing.") (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (*per curiam*)). It is also presumed that a notice provided by a government agency was mailed on the date of the notice. *Id.* at 526 (citing *Baldwin County*, 466 U.S. at 148 n. 1, 104 S.Ct. 1723). These presumptions might lead the Court to conclude that Everson's "right to sue" letter was received on March 18, 2000, three days after the date on the letter. Such a conclusion would render Everson's Title VII claims untimely, notwithstanding his denial that he received

---

**4.** The Court may consider this document on a motion to dismiss under Rule 12(b)(6), because it is incorporated by reference in the Complaint (*see* Compl. ¶ 3), it is integral to the Complaint, and it is known to Everson. *See Yak v. Bank Brussels Lambert, BBL (USA)*, 252 F.3d 127, 130–31 (2d Cir.2001); *Ruiz v. N.Y.C. Fire Dep't.*, No. 00 CIV 4371, 2001 WL 767009, at *1 n. 2 (S.D.N.Y. July 9, 2001).

**5.** Everson also offers no explanation by way of affidavit, likely because such an affidavit cannot be considered by the Court on a motion to dismiss.

**6.** In an attempt to strengthen the presumption that Everson received the "right to sue" letter shortly after it was mailed, the NYCTA asserts that it received a copy of the letter on March 17, 2000. (*See* Def. Ex. C.) However, the Court cannot consider the NYCTA's exhibit on a motion to dismiss, as it is a document outside the pleadings. In any event, the outcome of the NYCTA's motion would not change even if the Court were to consider the document.

the letter. *See, e.g., Hill v. Textron Auto. Interiors, Inc.,* 160 F.Supp.2d 179, 184–85 (D.N.H.2001) (unsupported denials of receipt of "right to sue" letter insufficient to overcome presumption of receipt three days after mailing); *Lin v. N.Y.C. Admin. for Children's Servs.,* No. 99 CIV 10314, 2001 WL 964016, at *3 (S.D.N.Y. Aug. 23, 2001) ("where the plaintiff's denial of receipt is unsubstantiated, courts have found that the ninety-day period begins three days ... after the notice is sent regardless of when, if ever, the plaintiff received the notice"); *see also Bond v. Am. Med. Ass'n,* 764 F.Supp. 122, 125 (N.D.Ill.1991) (statute of limitations began to run on date of "right to sue" letter, notwithstanding plaintiff's allegation of non-receipt, due to plaintiff's three-year delay in following-up with EEOC to determine status of letter).

However, the NYCTA has challenged the timeliness of Everson's Title VII claims via a motion to dismiss under Rule 12(b)(6). As noted above, in considering such a motion, the Court *must accept as true* the factual allegations in the complaint. *Bolt Elec., Inc.,* 53 F.3d at 469. Here, Everson has specifically alleged that he did not receive the "right to sue" letter, and that he first became aware of that letter on December 18, 2001. (*See* Compl. ¶ 3.) Accepting this allegation as true would render Everson's Title VII claims timely. *See, e.g., Lin,* 2001 WL 964016, at *4 (where plaintiff never received "right to sue" letter, 90–day period began to run on date plaintiff received actual notice of 90–day limitations period). Although Everson's allegation that he never received the "right to sue" letter is highly suspect, and is unexplained, the Court nevertheless is constrained to deny the motion to dismiss for this reason.

Judge Schwartz of the Southern District recently was confronted with this same issue. In *Ruiz v. New York City Fire Department,* No. 00 CIV 4371, 2001 WL 767009 (S.D.N.Y. July 9, 2001), the plaintiff's "right to sue" letter was dated March 2, 2000; thus, the presumption was that the plaintiff received the "right to sue" letter on March 5, 2000. The plaintiff did not commence her action until June 13, 2000, more than 90 days after March 5. However, the plaintiff alleged in her complaint that she did not receive the "right to sue" letter until March 15, 2000. Judge Schwartz ruled that, because he had to accept this allegation as true for purposes of the motion to dismiss, the plaintiff's complaint was not untimely. *Id.* at *2.

The Court follows Judge Schwartz's logic, *i.e.,* it accepts Everson's allegation as true, and deems his Title VII claims timely for purposes of this Rule 12(b)(6) motion only. The NYCTA can investigate the veracity of Everson's allegation of non-receipt during discovery, and bring a motion for summary judgment on this ground at a later date. At that time, Everson may submit an affidavit or other evidence in support of his claim that he never received the "right to sue" letter and only became aware of it on December 18, 2001. For now, however, the Court rejects the NYCTA's motion regarding the 90–day limitation period.

### B. The "continuing violation" doctrine

■ The NYCTA next argues that, because the statute of limitations for claims under 42 U.S.C. §§ 1981 and 1983 and the New York Human Rights Law is three years, Everson's claims under those statutes—to the extent they are predicated on acts which occurred in 1995 and 1996—are barred by the respective statutes of limitations. The NYCTA also argues that, under Title VII, a charge of discrimination must be filed within 300 days of the alleged discriminatory act. Because Everson did not file his EEOC charge until April 13, 1999, the NYCTA asserts that, to the extent the Title VII claims are based on the decisions to deny Everson pro-

motions in 1995 and 1996, the Title VII claims also are time-barred. (*See* Def. Mem. at 6–9.) In opposition, Everson argues that the 1995 and 1996 decisions to deny him promotions are timely under the "continuing violation" doctrine. (*See* Pl. Opp. at 9–11.)[7] This argument is meritless.

 The continuing violation doctrine "extends the limitations period for all claims of discriminatory acts committed under [an ongoing policy of discrimination] even if those acts, standing alone, would have been barred by the statute of limitations." *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997)). However, courts in this circuit look unfavorably on "continuing violation" arguments. *See, e.g., Simmons v. N.Y.C. Health & Hosp. Corp.*, No. 99–CV–3181, 2001 WL 483675, at *3 (E.D.N.Y. Mar. 30, 2001); *Lloyd v. WABC–TV*, 879 F.Supp. 394, 399 (S.D.N.Y. 1995). To invoke the doctrine, a plaintiff must show either (1) specific ongoing discriminatory policies, or (2) specific and related instances of discrimination that are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice. *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 82 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998). The acts about which a plaintiff complains must be continuous in time with one another and with the timely acts the plaintiff has alleged for the doctrine to apply; a lack of temporal continuity in allegedly discriminatory acts is "fatal" to a "continuing violation" argument. *Quinn*, 159 F.3d at 766; *accord Griffin v. N.Y.C. Off–Track Betting Corp.*, No. 98 CIV 5278, 2002 WL 252758, at *3 (S.D.N.Y. Feb. 20, 2002).

Here, there can be little doubt that the denials of promotions in 1995 and 1996 are too disconnected in time from the acts occurring in 1998 and forward to permit Everson to invoke the "continuing violation" doctrine. While the acts in 1995 and 1996 are closely related in time to *each other*, a two-year-and-five-day period followed those acts with *no* incidents of discrimination, until Everson was denied a promotion on September 18, 1998. In such a situation, the "continuing violation" doctrine cannot apply. *See Weeks*, 273 F.3d at 84 ("Absent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception."); *Quinn*, 159 F.3d at 766 (acts occurring in breaks of 3 years, 1 year, and less than one year too disconnected); *Vernon v. Port Auth. of N.Y. & N.J.*, 154 F.Supp.2d 844, 851 (S.D.N.Y.2001) (first gap of 3 years, followed by second gap of 7 months, between discriminatory incidents too discontinuous to invoke "continuing violation" exception). Accordingly, Everson's claims are time-barred, to the extent they are predicated on the decisions to deny him promotions in 1995 and 1996.

## IV. The Claims Under the New York City Administrative Code are Viable

 The NYCTA next argues that Everson's claims under the New York City

---

7. The parties spent substantial portions of their briefs discussing the effect of a Dispute Resolution Agreement on the timeliness of the instances of discriminatory conduct complained of by Everson. (*See* Pl. Opp. at 1–4, 8; Def. Reply at 7–8.) The Court need not consider those arguments, however, as the parties appear to agree that the allegedly discriminatory acts occurring in 1998, 1999 and 2000 are timely. (*See* Pl. Opp. at 8; Def. Reply at 7–8.) The only dispute between the parties concerns the timeliness of the acts occurring in 1995 and 1996, and Everson's sole argument regarding the timeliness of those acts is the "continuing violation" doctrine; he does not rely on the Dispute Resolution Agreement in arguing that the 1995 and 1996 denials of promotions are timely.

Administrative Code must be dismissed, because "municipal laws, such as the City Administrative Code, are not applicable to the Transit Authority." (Def. Mem. at 9.) In support of this proposition, the NYCTA points to New York Public Authorities Law § 1266(8). As recently amended, that section states, in pertinent part, that "no municipality or political subdivision, including but not limited to a county, city, village, town or school or other district[,] shall have jurisdiction over any facilities of the ... New York City Transit Authority ... or any of [its] activities or operations." In opposition to the NYCTA's motion, Everson argues that, in *Levy v. City Commission on Human Rights*, 85 N.Y.2d 740, 628 N.Y.S.2d 245, 651 N.E.2d 1264 (1995), the New York Court of Appeals held that claims may be brought against the NYCTA under the Administrative Code, notwithstanding Section 1266(8). (*See* Pl. Opp. at 12–13.) A fair reading of *Levy* suggests that Everson is correct.

In *Levy*, the petitioner, a former NYCTA employee, filed a complaint with the New York City Commission on Human Rights, alleging that the NYCTA had discriminated against her on the basis of her gender. After the Commission awarded relief to the petitioner, the NYCTA instituted an Article 78 proceeding, challenging the Commission's jurisdiction over it. At that time, Section 1266(8), while similar in language to its current form, only exempted the Metropolitan Transportation Authority from the reach of local laws; there was no mention of the NYCTA in Section 1266(8). The trial court determined that the NYCTA was subject to the jurisdiction of the Commission, and the Appellate Division affirmed.

The New York Court of Appeals affirmed the Appellate Division. The Court first recognized that public authorities were "independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission." *Id.* at 744, 628 N.Y.S.2d at 247, 651 N.E.2d 1264. Nevertheless, that autonomy was not unlimited; the Court held that public authorities were independent and autonomous only "to the extent that they should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation's purpose." *Id.* at 745, 628 N.Y.S.2d at 248, 651 N.E.2d 1264. Because prohibitions against employment discrimination, in the Court's opinion, would not interfere with the function and purpose of the NYCTA, *viz.*, "to acquire and operate transit facilities," *id.*, the Court held that the NYCTA was subject to the human rights provisions of the Administrative Code.

The NYCTA argues that the recent amendment to Section 1266(8), which specifically exempts the NYCTA from the reach of local laws, makes it clear that the NYCTA cannot be subject to the Administrative Code. This argument is not persuasive. Even though Section 1266(8), on its face, now exempts the NYCTA from local laws, the upshot of the holding in *Levy* is that Section 1266(8) will only exempt the NYCTA from the reach of local laws which "interfere with the accomplishment" of the NYCTA's purpose. And, as the *Levy* Court held, compliance with local human rights laws will not interfere with the NYCTA's purpose. *See Wahlstrom v. Metro–North Commuter R.R. Co.*, 89 F.Supp.2d 506, 527 n. 21 (S.D.N.Y.2000) (relying on *Levy*, and rejecting contention that Metro–North railroad not subject to New York City Human Rights Laws as a result of Section 1266(8)); *see also Huerta v. N.Y.C. Transit Auth.*, 290 A.D.2d 33, 39, 735 N.Y.S.2d 5, 10 (1st Dep't 2001) (citing *Levy*, and holding Transit Authority subject to New York City Administrative Code provisions regarding escalator safety,

because such provisions "would hardly interfere with the accomplishment of the Transit Authority's purpose"). Thus, there is no reason to conclude that, despite the recent amendment to Section 1266(8), the New York Court of appeals would today decide that the NYCTA is exempt from the reach of the New York City Administrative Code. Accordingly, the Court must deny the NYCTA's motion to dismiss the claims under New York City's Administrative Code. *See Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir.1996) ("a federal court acts essentially as a state court in addressing pendent state law claims"); *Rounseville v. Zahl*, 13 F.3d 625, 629 n. 1 (1994) (a "District Court is bound to apply state law when ruling on a pendent state claim").

## V. *Everson Cannot Recover Punitive Damages Against the NYCTA*

 The NYCTA's final argument is that Everson's request for punitive damages should be dismissed, because the NYCTA, as a public benefit corporation, is immune from punitive damages. (*See* Def. Mem. at 10.) Everson has failed to respond to this argument, and it appears that the NYCTA is correct. *See, e.g., Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 386–88, 521 N.Y.S.2d 653, 655–56, 516 N.E.2d 190 (1987) (Long Island Railroad, as public benefit corporation, exempt from imposition of punitive damages); *Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 324, 659 N.Y.S.2d 27, 29 (1st Dep't 1997) ("the state and its political subdivisions, as well as public benefit corporations such as the instant Transit Authority defendants, are not subject to punitive damages"). Everson's claim for punitive damages therefore is dismissed.

## CONCLUSION

For the foregoing reasons, the NYCTA's motion to dismiss is granted in part and denied in part. Specifically, the Court dismisses (i) the conspiracy claims under 42 U.S.C. §§ 1985 and 1986, (ii) the remaining claims, to the extent predicated on decisions to deny promotions to Everson in 1995 and 1996, and (iii) Everson's claim for punitive damages. In all other respects, the motion is denied.

SO ORDERED.